Good morning. Good morning, counsel. You may proceed. Thank you. May it please the court, my name is Katherine Saldana, and I represent the appellants in this matter, Claire and Mark Headley. And before I forget, may I reserve five minutes of my time? You may do so, counsel, but we'll just watch the clock. Great, thank you. In this case, appellees claim on the one hand that they do not believe in or engage in the practice of forced labor, and on the other hand, they seek the protection of the First Amendment in order to defend against claims of forced labor. The simple fact is that where a religious organization does not have a religious justification for the conduct at issue, they cannot avail themselves of the protection of the First Amendment. And more importantly, regardless of whether or not a religious justification is offered, when the conduct at issue concerns a violation of a basic and fundamental constitutional right to freedom from involuntary servitude. Let me just ask this question. You have claims that your clients were engaged in forced labor. Doesn't this require the court to resolve religious questions by challenging the way the church governs itself and the discipline of the C organization? Why aren't we getting now into the ministerial exception? Well, the ministerial exception by all courts has only been recognized to apply in cases of minimum wage and hour or cases where it's a Title VII claim regarding discrimination or retaliation. And those cases touch on something that's different than this case, which is they deal with a church's decision to hire or fire a minister. So it's that core religious practice of determining who your minister is and who will represent you as a faith. This case is fundamentally different than those because we're touching on constitutional rights, fundamental constitutional rights to be free. There is a long line of case law that provides that even if a religious justification is offered, when you're touching on something that is so subversive of good order, that courts can regulate that conduct regardless of whether or not there is a religious justification. Let me ask the question. You said your clients couldn't get out. They couldn't get out of Scientology. They were forced. But didn't they know a number of people who had gotten out without suffering real harm? Wasn't that in the record? They knew numerous people who had left Scientology and their fears that they would be outcasts but they would be harmed if they left. Didn't they know of many other people who did without harm? The Headleys were aware of individuals who left the C organization. That is true. However, the record also reflects that Claire Headley was told that she had forgone her right to leave and that if she did leave, she would be found and brought back. The record also reflects numerous instances of individuals who did try to leave and were followed and were brought back. When they were brought back to Gold Base, they were placed under restricted watch. They were limited to the property. They were assigned demeaning assignments. So what you're really asking me to determine then is if psychological compulsion to stay is sufficient for me to probe the doctrine of the Church? In this instance, because Congress has defined the crime of forced labor to include psychological compulsion and made that express in response to the U.S. v. Kominsky case. And so therefore, you believe that I then should probe the doctrine of the Church to determine whether and if that doctrine is correct? No, I do not believe that you need to probe the doctrine of the Church. Well, I don't know how to arrive at whether there was psychological compulsion to stay unless I know what the doctrine of the Church is, do I? Well, actually, appellants outlined in their briefing a number of the conduct for which appellees do not offer a religious justification. And based on that conduct alone, the court could reach the issue of psychological compulsion. And in fact, that conduct included that they believe that individuals have inalienable rights to be free. They prohibit physical punishment or detention, physical abuse, battery assault, aggravated battery, physical isolation, the use or threats of physical intimidation, which appear in the record. They also prohibit involuntary confinement or holding a person against their will. They prohibit physically forcing, threatening, or otherwise coercing anyone to return to the C organization, including making threats that a person will never see their family members again. They also have policy that they must abide by the law. They do not believe in stalking or harassment. What's the best physical abuse allegation you have here? Well, there's plenty of allegations of physical abuse. What's the best? The best. Well, I think the best is... I mean, my worry is that in any one of these allegations that you've made, by reading your complaint pretty carefully, that they all really go to psychological compulsion. I believe that the best examples of physical abuse is the abuse that was suffered by Mark Hedley. He was physically assaulted by the head of the church on more than one occasion. However, there's also evidence in the record that indicates that co-workers of Claire Hedley were physically abused in her presence on at least 50 instances. The spokesman for the Church of Scientology acknowledged that between the timeframe of 2000 to 2004, there were at least 50 instances of physical violence against members of the C organization by high-ranking officials. The important thing within the forced labor statute is that these acts of physical violence, whether or not they're against the Hedleys or against their co-workers, they're intended to make them believe that they would suffer the same consequences if they don't fall in line and continue to waiver for appellees. So all of these acts of physical violence go to the issue of psychological compulsion. And again, they don't justify physical violence by means of a religious doctrine. So you're not getting into the church doctrine by reviewing that evidence, regardless of whether or not it goes to the issue of psychological compulsion. But I think, again, regardless, the primary issue in this case that I must stress is that there's a long line of Supreme Court precedent that makes very, very clear that all churches are allowed to think whatever they want. You can believe in anything. But when those beliefs turn into actions, and actions that are subversive of good order, then a court may regulate that conduct regardless of whether or not there's a religious justification for it. I also want to address the fact that the district court rules that appellants failed to demonstrate as a matter of law that their claims were forced within the meaning of the Trafficking Victims Protection Act, which is also known as the TVPA. The district court, in reaching that conclusion, very narrowly viewed the evidence, particularly the evidence of the physical abuse that occurred, the testimony that was presented by the Headleys, and in fact characterized the Headleys' testimony at the summary judgment stage as lacking credibility. Well, there was evidence that the Headleys were happy for a long time, and there was also evidence that they lived outside the compounds, they were free to come and go, they traveled, they had access. What was there preventing them from just leaving? The pure fear that they would be brought back and forced into hard labor? Precisely. Claire Headley was specifically told that she had forgone her right to leave. And I want to make clear that while there's this statement that Claire Headley said she thought she enjoyed herself while working, the question that was posed to her is a little bit different. If you look at the actual record, the question that was posed to her is, over the course of the 15 years that you were there, you never enjoyed one moment of your work? And what Claire explained is, well, I was trained to believe that my work was enjoyable. I knew this religion from the time of four. I joined the SEA organization and signed a billion-year contract at the young age of 16. And if you look at all of the circumstances, she had nothing to compare her work to. She had no idea as to whether or not this was enjoyable or not. But she also presented substantial evidence that her work wasn't enjoyable. She said that she was forced to have two abortions. She said that she was ordered to divorce her husband. She said that she was restricted to the gold-based property on numerous instances. She talked about observing her coworkers being physically abused. She talked about actually being ordered to convince one of her coworkers to divorce her spouse. So there's plenty of evidence in the record that indicates that her work was not enjoyable. And on the issue of the physical ability to leave, it is true that at times the Headleys lived off of gold base. There were times when they were restricted to gold base as well. But during those times, each of the facilities that they lived in were controlled by Scientology. It was housing provided to them by Scientology. They had security guards present at those facilities. And as the record reflects, even when the Headleys attempted to physically leave, they were followed. Mark Headley was chased off of a road. His keys were confiscated from him. It required police involvement in order for him ultimately to get away. And even once the police were involved, he was followed by another car coming from the C organization. So there's plenty of evidence that demonstrates that it was incredibly difficult for them to leave, regardless of whether or not they had the physical opportunity to do so. And again, there's plenty of evidence in the record that indicates that members who did leave were followed and brought back. In fact, there's evidence that they would look into their... I mean, I don't think there's anyone on the bench who is not... their heart doesn't go out to your clients. I guess my worry is that even with our heart going out to our clients, whether we can determine that this psychological compulsion, if you will, is sufficient to do something here. And it frankly hampers you. Because we can't look at what the church teaches or doesn't teach. We can't look at what their doctrine is or isn't. The only thing we have in this record that gives me any indication that I have a chance to act in any way is that the church does not assert that the ministerial exception would prohibit a claim to the extent the claim relies on the allegation of physical abuse. That's the only thing I have in this record that would suggest that I have any way to act without looking at what their doctrine does. Which you're hampered in the same way. We talk about all of the actions, but we can't talk about what the doctrine is because ministerial exception will not let us talk about the doctrine. You admit they were ministers. You admit then that because they were ministers, they even went to the Sea Org of their own free will, and it's obvious from the record they could have left the ministry at any time. So we're really talking about is that psychological, if you will, compulsion enough to undo? And again, in order for me to truly understand that, it seems to me I have to look at the doctrine of the church, and yet you can't look at it and neither can I. That's my worry. Respectfully, I do disagree on the point that the court cannot look at the doctrine of the church. There is case law, Turner v. Unification Church, and also the Shukla v. Sharma case, that indicate that regardless of whether or not there is a religious justification for the conduct, when it rises to the level of involuntary servitude or the crime of forced labor, which in this case is defined by the government. Are you against cases for that? Those cases certainly go to the point, yes. I also believe that the court should look at the long line of U.S. Supreme Court cases, United States v. Lee, the Prince case, United States v. Reynolds. When it is so subversive of good order and touches on such a basic constitutional right, regardless of whether or not a religious justification is offered, the court can examine that because it's subversive of good order and it's contrary to the laws and policies of this country and the basic human rights in this country. And in order to preserve some time, I'd like to stop now. You may do so, Counsel. Thank you. You will be at the church. Good morning, Your Honors. My name is Eric Lieberman. I represent the Church of Scientology International. I'm arguing on behalf of both of the church defendants. Counsel, just before you get started, one of the things that concerns me about the case is there are conceivable scenarios in which the ministerial exception does not apply. We have a case involving sexual violence and torture. How do we distinguish this case? A case involving sexual violence? Yes. You're talking of the Shukla case? Yes. Okay. The Shukla case, which was an order by a magistrate judge, was entirely different, as we discuss in our brief. What happened in that case was basically it was a bait-and-switch situation where somebody was invited to come over to work as a Hindu priest and his visa expired. And he was then coerced by both the threats of being deported and by threats of being murdered to work not as a Hindu priest, but to work as a household servant. And there was no claim that his work as a household servant had anything to do with working as a priest. In fact, they argued in their brief that he had been lured to be a priest, but that the threats had to do with his doing secular work. In fact, even the plaintiffs made clear that there was no claim that any religious criteria applied whatsoever to the jobs they were doing. Here, in contrast, everything these people did, the plaintiffs did, was as members of the C.E.O.R.G. And every function they performed was as members of the C.E.O.R.G., as parts of their labor for the Church. I would like to say that the issues in this case really can be viewed very narrowly. Excuse me, Counselor. I misspoke when I said yes to the Shepherd case. I was talking about Bollard v. Cal Province of the Society of Jesus, a Ninth Circuit case holding that the ministerial exception would not bar a Title VII claim of sexual harassment. Well, yes. To address that case, in that case the Court held that some aspects of those claims would be barred by the ministerial exception, but the part that would not be, the majority said, was the claim that the underlying acts that were alleged constituted sexual harassment. And in that case, the Church made no claim that those underlying acts had anything to do with religious doctrine. In fact, they repudiated them. So the majority found that that would enable the Court to carve out that particular aspect. Excuse me. In this case, the predominant acts that the plaintiffs emphasized, many of them, they say, of the psychological and social coercion acts that they're claiming constituted coercion here. And what they say is these are the most important ones. All relate to the plaintiff's participation in the religion. They say, for example, that among those psychological and social factors were the very fact that they were born into the religion, that their upbringing was in the religion, that they were taught and raised to believe in making the commitment to the Sea Org. Also, their participation in the central religious practice of oddity. This is one of the psychological and social factors they point. Also, their belief that through participation in Scientology practices they would be able to achieve eternal spiritual salvation. And their belief that through participation in the Sea Org they would be able to further the Scientology religion's goals of what they call a cleared planet, which is referred to in our brief. And their belief that if they didn't pursue those practices they would not be able to achieve spiritual salvation. They also point to what they say are strange precepts of Scientology unlike those common to the general population which cause the plaintiff to see themselves as apart from the general population. If we're going to start evaluating strange precepts of various religions there are numerous religions in this country as Justices Thomas and Alito pointed out in their concurrences that have practices which as Justice Thomas said may not be in the mainstream or may not be palatable to the usual mainstream society but nevertheless are protected. They also say that among the factors that the social and psychological factors that cause them to remain performing their labor were what the District Court referred to as the lifestyle constraints of membership in the Sea Org itself including regimented work hours, long work hours isolation from the secular world although as we point out in the brief and some of the comments of the Court earlier point out their isolation was much less than that that occurs in many religious orders of monks and nuns and priests throughout the world in various religions. I was interested that you in your brief suggest that the Church does not assert the ministerial exception would prohibit a claim to the extent the claim relies on allegations of physical abuse. Do you agree with that? That's what I read. If that were the only claim in the case that a plaintiff was claiming I was physically forced, seized, brought to work chain gang style and forced to work and there were no other factors that caused me to do that work and I wanted to get out of there and there were none of these psychological and social factors complicating the question then we think yes, that would not be protected by the ministerial exception. So when you read the complaint and you read the allegations of abuse physical abuse I read those allegations do you think that suggests that I the ministerial exception does not apply to those complaints? Well, Your Honor, as I'm trying to explain here you have here a much more complex picture. You have a picture where the plaintiffs themselves through their own testimony have stated that they continued to want to work for the C.R.O.C. Claire Headley said she was doing what she was brought up to do. In 2004, just a month or so before she left she lost her position at Religious Technology Center and in her own words petitioned, she was distraught at losing this position and she petitioned and pleaded and begged to be restored to the position of working for R.T.C. which she now claims she was forced to labor at. So that they set forth all these psychological and social factors and they say they say that our complaint would be untenable without them. Why did they say that? Because as Judge Nelson pointed out these people were not held there all the time. They lived in various apartments not all the time right next to the base 15, 20 minutes away. They traveled all over the world. They had motor vehicles. They had telephones. And their response to this is well there were all these social and psychological factors that made us continue to work including how we were brought up and what we were taught to believe and also that if if they chose to just precipitously leave their C-Org position and break their vows without following procedures set forth in church scripture for doing so that they might be excommunicated and lose contact with their friends and family. Something that as we show is not unique to the Scientology religion by any means. So that the narrow and precise issue before the court in We Submit requires the court only to decide that at the least the ministerial exception and the First Amendment religion clauses upon which from which it derives bar a forced labor claim premised upon these social and psychological factors which relate to the beliefs the religious upbringing the religious training the religious practices the religious lifestyle restraints of a religious order and the rules and customs and discipline of a church. This is how they presented their case. This is what the facts show. It can't be then we can't then put all that aside and say, well, there are these allegations that some people that there were some physical assaults and let's just look at that because by their own case that's not what was really going on. So what you're saying is even though there are such allegations they didn't leave as a result of it. They kept going because it has to do with psychological compulsion what they really wanted to do and to examine that I have to look at the doctrine of the church? That's precisely right, Your Honor. In fact, the following... So are you saying then in each of these cases where we just find that what has happened if it is as alleged is a travesty is not something we'd ever suggest anybody ought to do to another human the best we can say is I won't join that church. Is that what you're saying? Well, if one were to accept these allegations you could come to that conclusion but what you can't do is come to a judicial conclusion based upon the whole range of factors that are here not these... those are allegations of physical abuse which must be accepted because this is summary judgment. But what is not disputed in the record are all these other factors which they say even in this court they say and even in oral argument counsel said that well, it's true Claire Headley thought she enjoyed doing this labor but she didn't know any better because she'd been brought up in the religion and it wasn't until she got out and had other experiences that she figured out that she really wasn't enjoying herself and didn't enjoy her labor but she did while she was there and she pleaded to keep her job just a month before she left so we think on that record the ministerial exception applies and precludes this case going forward any further. Thank you very much. You're probably welcome. I'm sorry, I had meant to address Khazanah Taboor as Your Honor could ask but I guess we don't have time for that. Very well, thank you. Ms. Saldana, you have some reserve time? I want to quickly address this kind of... the distinction that's being drawn between physical acts and psychological coercion. There is... if the court is truly concerned again, the appellant's position is that the crime of forced labor is so heinous and contrary to the rights of every American citizen that no religion no entity no one should be allowed to engage in that act and that regardless of whether or not a religious justification is offered for the conduct the court can review that because it's contrary to the laws of this country and to the basic constitutional fundamental rights of individuals. Well, I guess your argument it seems to run directly contrary to Elvig where Elvig says in short the First and the Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government and to create tribunals for adjudicating disputes over these matters. While this choice is exercised and ecclesiastical tribunals are created to decide the disputes the Constitution requires civil courts accept their decisions. So this was in that kind of a situation and I guess that's where I am if this is internal discipline and government of the church and I have to look at the doctrines of it in order to make the difference I'm still having a tough time even as bad as you suggested to be how I can get there. Okay. Well, I think there's a line that can be drawn between the Elvig case the Bullard case the Hosanna-Tabor case all the cases in which a ministerial exception has been found to exist. And those cases concern things like minimum wage an hour Title VII claims to discrimination retaliation sexual harassment things of that nature. This case concerns something that's fundamentally different. It's a claim of forced labor. It's a claim for involuntary servitude. So I am going to weigh and suggest that this forced labor claim is not as good as sexual harassment claim or better? I don't... I believe that that's that's not the distinction that I'm trying to draw but that this case touches on a fundamental constitutional right. This country was created on the basis of freedom. The 13th Amendment was enacted to ban involuntary servitude and slavery and Congress in enacting the forced labor statute recognized that this the definition that they've given for forced labor is a crime of involuntary servitude and they're trying to address modern forms of slavery. And I believe that touches on something that is much more fundamental and core to the rights of citizens in this country than a claim for sexual harassment. And that's the distinction between each of the cases that have accepted a ministerial exception and I see that my time is up. Thank you, Counsel. Thank you. The case just argued will be submitted for a decision. We will hear argument next in Chevron USA versus Shakeforth.
judges: Nelson, O'scannlain, Smith